## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**KAREN LUNDREGAN,**               *

      Plaintiff,               *

v.                                 *                   Civil No. **PJM 19-1369**

**HOUSING OPPORTUNITIES**          *
**COMMISSION,** *et al,*           *

      Defendants.               *

## MEMORANDUM OPINION

In May 2019, Karen Lundregan, at the time *pro se,* sued the Housing Opportunity Commission of Montgomery County ("HOC") and six of its members, alleging violations of several laws purportedly protective of her status as a recipient or prospective recipient of an HOC voucher subsidizing her housing costs. In a Memorandum Opinion dated May 7, 2020, the Court denied in part and granted in part Defendants' Motion to Dismiss, leaving only two Defendants in the case — HOC and Ethan Cohen, the HOC employee responsible for processing requests for reasonable accommodation for HOC voucher-seekers during the relevant time period. Additionally, only two issues were allowed to go forward:

(1) Whether the HOC in its official capacity and Cohen in his individual capacity violated the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 et seq., by denying Plaintiff a reasonable accommodation for her mental and emotional disabilities by, inter alia, failing to reinstate her housing voucher for several months (from the termination of her voucher in April 2018, until its reinstatement in September 2018); and

(2) Whether the HOC in its official capacity and Cohen in his individual capacity violated 42 U.S.C. § 1983, specifically Plaintiff's due process rights, by not affording her a final hearing before terminating her housing voucher.

ECF No. 168; *see also* ECF Nos. 81, 108.

1

Defendants have jointly filed a Motion for Summary Judgment (ECF No. 180), to which Lundregan, now represented by *pro bono* counsel, has filed an opposition. Lundregan has also filed her own Motion for Summary Judgment (ECF Nos. 196, 198), which Defendants oppose (ECF No. 205). For the reasons that follow, the Court will **DENY** both Motions.

## I.   FACTUAL BACKGROUND

Lundregan has mental and emotional disabilities linked to Post-Traumatic Stress Disorder and a Borderline Personality Disorder of which, some evidence suggests, Defendants have been aware since at least September 2017. ECF No. 228 at 62. She alleges that for several months in 2018 Defendants unduly delayed renewing her request for a reasonable accommodation to obtain a housing voucher, *i.e.*, by not reinstating the voucher which she previously held, which she claims is due her by statute,[1] and by requesting unduly invasive and unnecessary information from her and her doctors purportedly in order to verify what they were well aware of — that she suffers from the aforementioned disabilities. Lundregan also claims that, at least at one point, HOC illegally terminated her housing voucher.

Between December 15, 2015, and March or April of 2018, Lundregan was receiving rent subsidies from HOC for an apartment at 9701 Fields Road (Apt. #804) in Gaithersburg, Maryland. ECF No. 228 at 3–4. As of August 21, 2017, when she filed a written complaint with HOC Affairs against her landlord Ardash Ramakumar alleging housing code violations, Lundregan found herself embroiled in constant dispute with Ramakumar over a number of issues. She alleges that Ramakumar was abusive and vindictive towards her such that, in November of 2017, he filed an eviction proceeding against her. She avers that she and Ramakumar settled their dispute, whereby Lundregan agreed to vacate the Fields Road apartment. *See id.* at 3; *see also* Pl.'s Exs. 10, 16.

---

[1] *See* 42 U.S.C. § 3604(f)(1) ("[I]t shall be unlawful . . . [t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a [disability].").

On March 7, 2018 — a week before Lundregan actually vacated Fields Road — HOC sent her a letter stating that, as of April 30, 2018, HOC would be terminating her housing subsidy because of "Delinquent Rent." Def.'s Ex. 9.[2] Lundregan claims that her housing assistance payments actually stopped as of March 7, 2018, though Defendants argue that HOC in fact made payments to her until the end of April 2018.[3] ECF No. 228 at 5. The March 7 letter did advise Lundregan that she could appeal the prospective decision to terminate her subsidy and request an informal hearing, which she did.

On March 14, 2018, Lundregan left the Fields Road apartment, lodged at an Airbnb for a short spell, then, around mid-April, ended up at 7917 Yellowstone Way in Derwood, Maryland. *Id.* at 3–4; *see also* Pl.'s Ex. 26. Meanwhile, on April 5, 2018, an informal hearing at HOC regarding the prospective termination of Lundregan's subsidy took place. By then Lundregan had paid the delinquent rent but, at the hearing, HOC presented her with some fifteen pages of new charges based, she says, almost exclusively on the word of the former landlord (Ramakumar) with

---

[2] Lundregan admits that she was delinquent in her rent but explains that she was unable to pay during the months of October and November because, starting in September 2017, by reason of her disability she was hospitalized for considerable time at Sheppard Pratt, a mental health facility in Baltimore. She apparently advised HOC of her hospitalization in September 2017 and claims that "[a]s soon as she was released, she tried to pay that rent" but the landlord at the time (presumably Ramakumar) "was trying to evict her, so he wouldn't accept her payments." ECF No. 228 at 31–32, 62; *see also* Pl.'s Exs. 11, 12. It is undisputed that, as of November 15, 2017, HOC knew that Lundregan had paid the rent she owed. Pl.'s Ex. 12. Even so, HOC apparently went ahead and issued her a notice of termination based on delinquent rent, never withdrew that notice, and continued to state that her subsidy was being terminated at least in part due to delinquent rent. *See* Def.'s Ex. 14. Interestingly, when the Court, at oral argument on the parties' current motions, asked defense counsel about Sheppard Pratt, counsel stated she did not know whether it was a general hospital or a metal health facility. ECF No. 228 at 72. In fact, Sheppard Pratt is the largest private, nonprofit provider of mental health services in the nation. *See* Sheppard Pratt, *Why Sheppard Pratt?*, https://www.sheppardpratt.org/why-sheppard-pratt/.

[3] Defendants say that Lundregan stopped receiving payments as of April 25, 2018, when her voucher expired but started receiving payments again in September 2018, once she submitted a qualifying request for tenancy approval as well as the required paperwork. The parties therefore agree at least that Lundregan did not receive housing assistance from April 25, 2018, through September 2018.

whom she had been at odds. Given the new charges, the hearing was suspended to allow Lundregan time to retain legal counsel.

About a week later, on April 11, 2018, HOC sent Lundregan another letter advising her that her rental subsidy payments would terminate on April 30, 2018, this time based on "Lease Violation(s) Community Disturbance-Property Damages." Def.'s Ex. 11. Again, Lundregan was advised of her right to appeal the decision and have an informal hearing. This, through *pro bono* counsel, she did, and a hearing was scheduled for April 25, 2018. Lundregan says that on April 23, 2018, she submitted to Cohen a written request for a reasonable accommodation, asking "that HOC restore her voucher to allow her to find a new home." Def.'s Ex. 12 at 2.

At the time, Lundregan was the holder of a Housing Choice Voucher that was unquestionably set to expire on April 25, 2018, the day of the hearing. Def.'s Ex. 6.[4] But at this second hearing, HOC presented Lundregan (and her Legal Aid attorney) with a list of yet further charges. According to Lundregan, when her counsel objected to the additional charges being added at the last minute, the hearing examiner advised her that she could appeal the termination by requesting another informal hearing. He also told her that if her counsel would write a letter requesting an extension, he would extend her voucher beyond the April 25, 2018, termination date.

Lundregan's counsel apparently wrote such a letter, but Lundregan says to no avail. Pl.'s Ex. 24. Defendants' position is that Lundregan did not explicitly state in writing prior to April 25, 2018, that she was requesting an extension, in consequence of which her voucher expired automatically. Lundregan counters that either her written reasonable accommodation request on April 23, or her counsel's verbal request on April 25 should have been sufficient for her voucher

---

[4] Housing Choice Vouchers automatically expire after 90 days unless the recipient submits a Request for Tenancy Approval and lease within the 90-day period or else obtains an extension. Def.'s Ex. 1 at 8-8.

to be extended. In any event, given the additional charges first presented on April 25, the hearing was continued again, this time to May 24, 2018.

Cohen submits that all the while he was actively considering Lundregan's reasonable accommodation request. Accordingly, he says, on May 11, 2018, he asked for further information from Lundregan and her third-party health care provider to help him determine if the accommodation should be approved. Def.'s Ex. 14. Lundregan argues that Cohen's request for this information was unduly invasive and unnecessary, and clearly a dilatory tactic, because she had already provided substantial medical records documenting her emotional and mental disabilities, and because her hospitalization at Sheppard Pratt in September 2017, based on her disability, was well-known to HOC. Nevertheless, Lundregan complied with Cohen's request and submitted additional documentation, including letters from her psychologist Dr. Andrea Gottlieb dated May 15, 2018, Pl.'s Ex. 30, and May 17, 2018, Pl.'s Ex. 32.

On May 23, 2018, the day before Lundregan's termination hearing was set to resume, Cohen informed her via email that he had decided "to approve the accommodation and cancel the hearing." Def.'s Ex. 19. Accordingly, on June 5, 2018, Cohen formally granted Lundregan an accommodation "for reinstatement of [her] Housing Choice Voucher." Def.'s Ex. 17. Lundregan argues, however, that it was in fact not until September 2018, some three months later, that her housing voucher was actually reinstated, as a result of which she was rendered "homeless" or at least denied a rent subsidy from March through mid-September.

As indicated above, while the Parties dispute whether Lundregan received subsidy payments through April 25, 2018, they do agree that she did not receive payments from April 25 through part of September. Defendants blame the pause in payment on the automatic expiration of Lundregan's housing voucher on April 25, her failure to submit necessary documents until July

25, 2018, her delay in submitting a request for approval of a qualifying tenancy until September, and her refusal to sign an accommodation approval letter until September 18, 2018. ECF No. 228 at 17–18. Lundregan says she refused to sign the approval letter drafted by Cohen because it contained derogatory statements about her that she disputed, which she never got a chance to contest. *See* ECF No. 228 at 9. Because of this, she insisted that several edits needed to be made; hence the delay.

Meanwhile, as Lundregan worked with Cohen on possible edits to HOC's approval letter, her new landlord at Yellowstone Way, Patrick Heinig, reached a point of frustration over her inability to pay rent to him. Accordingly, on May 21, 2018, Heinig sent an email to HOC stating that, while Lundregan was "a reputable and responsible tenant" who had "not caused [him] any problems," she would still need to vacate his property if she could not pay rent. Pl.'s Ex. 47. Lundregan says she explained this to HOC, *i.e.*, that she was facing eviction yet again, and reached out to HOC and Cohen requesting information as to the status of her voucher. In response to her pleas, however, Lundregan says all she got from HOC was in effect radio silence. ECF No. 228 at 39–40. As a result, in or around July 2018 she was forced to vacate Yellowstone Way. ECF No. 198-1. From that point, she lived in motels, relying on other housing assistance from Montgomery County, and eventually moved to the District of Columbia. ECF No. 228 at 10.

## II.    LEGAL STANDARD

A court may grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When determining whether a fact is in dispute, a court must draw all reasonable inferences and construe

ambiguities in favor of the nonmoving party. *See, e.g.*, *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The movant seeking summary judgment bears the initial burden of demonstrating that there exists no genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the movant satisfies this showing, the nonmoving party may not rest on mere allegations in her pleadings, *id.* at 322 n.3, or conclusory denials of fact. *See Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). A fact is material, and a genuine dispute of such facts will preclude summary judgment, only if it is one that "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

### A.    The Fair Housing Act (FHA)

The FHA makes it unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a [disability]." 42 U.S.C. § 3604(f)(1). More specifically, landlords are forbidden "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling . . . because of a [disability]." *Id.* § 3604(f)(2). FHA § 3604(f)(9) contains a limited exception to these prohibitions, allowing a landlord to reject "an individual whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damage to the property of others."

### B.    Due Process

Pursuant to Chapter 15 of the Administrative Plan for the Housing Choice Voucher Program, assistance to an individual may be terminated for violation of any serious or repeated violations of the lease. *See* 24 C.F.R. §§ 982.551(e), 982.552(c)(1)(i). If the individual disagrees

with the termination, she may request an informal hearing that must be held before the termination becomes effective.

In order to provide due process under the Fourteenth Amendment, the Supreme Court requires that a housing authority comply with five requirements prior to terminating housing assistance benefits: (1) timely notice from the housing authority stating the basis for the proposed termination; (2) an opportunity for the tenant to confront and cross-examine each witness relied on by the housing authority; (3) the right of the tenant to be represented by counsel; (4) a decision, based solely on evidence adduced at the hearing, in which the reasons for the decision for the termination are set forth; and (5) an impartial decision-maker. *Goldberg v. Kelly*, 397 U.S. 254, 266–71 (1970). These procedural requirements have been incorporated in federal housing regulations in 24 C.F.R. § 982.555 and clearly apply to a termination of housing benefits provided by HOC. *See Caulder v. Durham Hous. Auth.*, 433 F.2d 998 (4th Cir. 1970).

## III.   THE PARTIES' CONTENTIONS

Defendants argue that they are entitled to summary judgment on all of Lundregan's claims. They say that her FHA 42 U.S.C. § 3604(f)(3)(B) claim fails because Defendants properly and timely granted her reasonable accommodation request. Their position is that Lundregan's 2018 request, despite being renewal of a subsidy she had received since 2015, did not sufficiently explain the nexus between her disability and her requested accommodation. Further, says HOC, because of problematic reports HOC had received concerning Lundregan's behavior as a tenant, HOC suggests that it was obligated to ensure that her tenancy would not pose a threat to the community. Accordingly, say Defendants, Cohen properly requested further documentation from Lundregan and from her psychologist, Dr. Gottlieb, as a pre-requisite to granting Lundregan's accommodation request. Any delay in making her lease payments, Defendants submit, is

8

attributable to Lundregan alone, whose insistence on several rounds of edits to the accommodation approval letter before she would sign left her in the meantime without any subsidy to pay for housing.

As for Lundregan's Due Process Claim, Defendants argue that they did not violate 42 U.S.C. § 1983, specifically her Due Process rights under the Fourteenth Amendment, because they never actually terminated her subsidy, as opposed to simply having appropriate grounds to send her notices of their *intent* to terminate the subsidy, because she was given a hearing date to challenge the proposed termination, and because ultimately the hearing was cancelled and Lundregan was in fact granted the accommodation she sought. Defendants therefore insist that they never reached a final decision as to termination of Lundregan's entitlement to a voucher, *i.e.*, that they never in fact "terminated" her. Defendants also submit that the voucher Lundregan previously held automatically expired on April 25, 2018, because Lundregan failed to submit a written request for an extension prior to that date. HOC says that, even so, it decided to overlook the automatic expiration and honored the voucher request once Lundregan submitted appropriate documentation (a relocation packet and a compliant Request for Tenancy Approval) on July 25, 2018. At that point, a voucher was reissued effective on July 30, 2018, and Lundregan began receiving payments again in September when she submitted a qualifying lease and signed an approval letter.

Finally, Cohen argues that he is entitled to qualified immunity because he played no role in the decision to "terminate" (if indeed "termination" ever occurred) Lundregan's voucher. He was, he says, only involved in handling Lundregan's request for a reasonable accommodation.

Lundregan, for her part, asserts that Defendants violated her rights in multiple ways: (1) by treating her as terminated from the voucher program without objective evidence and without

9

holding a hearing at which she could confront and cross-examine the witnesses relied on by HOC; (2) by considering Lundregan a "direct threat" lacking any reliable objective evidence to consider her such; (3) by requiring her to submit unduly invasive and unnecessary medical information in support of her reasonable accommodation request which HOC already knew about; (4) by requiring assurances from her that she would continue to receive medical treatment as a condition of receiving a reasonable accommodation; and (5) by not immediately providing her with a housing subsidy even after they granted her a reasonable accommodation to extend and/or restore her voucher.

Key to Lundregan's argument is her claim that her former landlord, Ramakumar, was engaged in "a relentless smear campaign against her." ECF No. 198 at 2. According to Lundregan, Defendants were well-aware of Ramakumar's bias and therefore should not in any way have relied on his statements as a basis of its decisions regarding Lundregan's entitlement to a housing subsidy. Defendants certainly should not have done so, she says, without giving her the right to confront and cross-examine Ramakumar. Defendants, she continues, had no objective or reliable evidence upon which to base their conclusion that she posed a threat to others when they sent her the notices of termination (again she highlights the fact that she was not able to confront and cross-examine witnesses), nor, she argues, was it proper for Defendants to insist that she submit further medical information over and above what Defendants already knew about her mental health issues.

Lundregan emphasizes that, even though there was never an adjudication of Defendants' acceptance of the allegations of delinquent rent, property damage, and community disturbance, and despite the fact that Cohen "approved" her accommodation request on June 5, 2018, the approval letter she was given to sign contained many negative statements about her that she sharply disagreed with. Meanwhile, she says, Defendants continued to treat her voucher as "terminated."

Lundregan takes particular issue with HOC's statement that her problematic behavior was a predicate for her termination from the voucher program. This, she asserts, amounted to constructive denial of her reasonable accommodation request. Finally, she reminds that during the five months Defendants refused to recognize her voucher, she was rendered homeless or at least compelled to find transient housing.

As for Cohen, Lundregan argues he is not entitled to qualified immunity because, among other things, he unlawfully presumed that her disability would make her predisposed to causing disturbances, and, moreover, failed to give her a hearing at which she could confront and cross-examine the witnesses whose statements against her contributed to Cohen's presumption.

## IV.   ANALYSIS

As indicated, the Court has disposed of all issues except for the following:

(1) Whether the HOC in its official capacity and Cohen in his individual capacity violated the FHA by denying Plaintiff a reasonable accommodation for her mental and emotional disabilities by, inter alia, failing to reinstate her housing voucher for several months after it was terminated in April 2018, until its reinstatement in September 2018; and

(2) Whether the HOC in its official capacity and Cohen in his individual capacity violated Lundregan's due process rights by not holding a final hearing before terminating her housing voucher.

### A.   Defendant Cohen is not Entitled to Summary Judgment.

Cohen argues that he is entitled to Summary Judgment on the basis of qualified immunity. The Court disagrees.

Under this doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The defendant bears the burden of proving his entitlement to qualified immunity. *Danser v. Stansberry*, 772 F.3d 340, 345 (4th Cir. 2014).

As an initial matter, there is no dispute that Cohen is a public official for the purposes of qualified immunity; the only dispute is that the doctrine does not shield his actions here. As Housing Programs Coordinator, she argues, Cohen was responsible for processing requests for reasonable accommodations for HOC and was assigned to process Lundregan's request in April 2018.

To be sure, although the Fourth Circuit has not specifically considered the issue, other circuits and other district courts within the Fourth Circuit have found that housing authority officials are ordinarily protected by qualified immunity. *See e.g.*, *White v. Annapolis*, 439 F. Supp. 3d 522, 535–36 (D. Md. 2020) (holding that qualified immunity was available to executive director of a housing authority); *Gonzalez v. Lee Cnty. Hous. Auth.*, 161 F.3d 1290, 1299–1308 (11th Cir. 1998) (holding that qualified immunity was available to executive director of a housing authority against § 1983 and FHA claims).

The Court finds that as Housing Programs Coordinator for HOC, Cohen was and is a public official for the purposes of qualified immunity. The question remains whether he is protected by the doctrine here such that summary judgment must be granted in his favor.

Resolving questions of qualified immunity at the summary judgment stage involves a two-step inquiry: (1) whether the alleged facts, when viewed in the light most favorable to the party asserting the injury, demonstrate that the official's conduct violated a federal right; and (2) whether such right was "clearly established" as of the time of the alleged violation. *Tarashuk v. Givens*, 53 F.4th 154, 162 (4th Cir. 2022).

Lundregan claims that Cohen violated the FHA and her due process rights (a) by determining in the absence of objective, reliable evidence and by without holding a final hearing, that as a tenant she constituted a "danger" and a "threat," and (b) by unreasonably imposing

conditions with respect to her mental health treatment before granting her accommodation based on her disability. As a result, Lundregan argues that she was denied a subsidy she was entitled to receive from March or April 2018 through September 2018 when she was unable to secure permanent housing. The right at issue, in terms of the FHA, as Lundregan sees it, is the right of an individual to be free from discrimination on the basis of a mental disability with respect to the terms, conditions, or privileges of the rental of a dwelling under 42 U.S.C. § 3604(f)(2).

Did Cohen's conduct violate a federal right?

On May 11, 2018, Cohen sent an email to Lundregan's counsel that requested additional information from her and her health care provider to help him determine whether he should approve her request for reasonable accommodation. Def.'s Ex. 14. Cohen explained that he needed health verification from a health care provider because, "[c]onsidering that Ms. Lundregan's disabilities already once prevented her from being able to control herself to the point that she became delinquent with her rent, caused community disturbance, and caused property damage[, he did] not want to knowingly place her in a situation where such things could happen again." Def.'s Ex. 14 at 2. But then on May 23, 2018, when Cohen told Lundregan's counsel that he had decided to approve Lundregan's accommodation request, he added that it would be "essential" for Lundregan to "continue to follow the treatment regimen that her health providers have prescribed" because a "recurrence of her previous negative behaviors whether toward herself, her landlord, her neighbors, or HOC staff will more than likely lead her down this same road again." Def.'s Ex. 19 at 1. A few days later, on June 5, 2018, Cohen sent Lundregan's counsel a copy of the reasonable accommodation approval letter ("June Approval Letter"). *See* Def.'s Ex. 17. The Letter, composed by Cohen, included the following language:

> You requested that HOC reinstate your voucher because your disability-related needs unintentionally caused you to be evicted from your unit and terminated from

13

the voucher program. The problematic behaviors that led to your termination from
the program are a violation of the terms of the program . . . .

*Id.* at 3. The letter went on:

> HOC will approve you for reinstatement of your Housing Choice Voucher. HOC
> approves this reasonable accommodation in reliance upon your and your attorney's
> assertions that your relocation and continued treatment will prevent you from
> engaging in problematic behaviors which constitute a direct threat to yourself, your
> landlords, your neighbors, the property of others, and/or HOC staff.

*Id.* at 4. In order to receive the housing benefit, then, Lundregan would have to sign the June

Approval Letter. But this she refused to do so, objecting to Cohen's negative statements about her

on the grounds that they were based on unverified allegations by her allegedly biased former

landlord and because HOC had never actually adjudicated the alleged violations.[5] Furthermore,

says Lundregan, Cohen was well aware of the tumultuous relationship that existed between her

and Ramakumar, her former landlord, Pl.'s Ex. 44 at 2, in addition to which he knew that, even

though Lundregan disputed the acts she was alleged to have committed, she never was given the

opportunity to formally contest them because Cohen himself canceled the hearing, Def.'s Ex. 19.

Lundregan argues that she was justified in delaying signing the June Approval Letter until at least

some changes were made, even though it took until September 2018. Def.'s Ex. 21. In the

meantime, she received no subsidy payments from HOC.

The Court concludes thus:

A trier of fact could fairly determine that at least some major components of the rationale

HOC relied on to deny or delay Lundregan's reasonable accommodation request were either flat

out inaccurate or subject to mitigation. Lundregan's rent delinquency with Ramakumar had lasted

---

[5] The Court notes that while the June Approval Letter asserted that Lundregan had been "terminated from
the voucher program," Def.'s Ex. 17 at 3, Defendants since then have apparently taken the position that
they never "terminated" Lundregan's voucher because her accommodation request was ultimately
granted, there was never an informal hearing on her appeal nor was there ever a final decision. *See* ECF
No. 205 at 4–6.

14

for two months while she was hospitalized at the Sheppard Pratt mental facility in Baltimore and had apparently been resolved well-before the delay or denial of the subsidy renewal ensued.

Further, it is at least arguable that Cohen was not justified in concluding that Lundregan as a tenant posed a "direct threat" to others within the meaning of FHA § 3604(f)(9). The "direct threat" exception applies to "an individual whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damage to the property of others." FHA § 3604(f)(9). These are serious conclusions, hardly to be arrived at casually. But based on the evidence in the record, it is by no means clear that the damage the landlord Ramakumar accused Lundregan of amounted to "damage" at all, much less "substantial physical damage." (emphasis added). According to Lundregan, the "damage" she was accused of causing was predominantly that she left trash in her apartment; Moreover, there is no indication that Defendants ever received from the landlord any claims or receipts for repair costs. Nor apparently was Cohen in possession of evidence that Lundregan had ever committed or threatened to commit acts of physical violence against others, again a very serious allegation. Quite to the contrary, Cohen was in possession of a letter from Dr. Gottlieb, Lundregan's psychologist, explaining that in her experience, Lundregan "engages in nonsuicidal self-injury and *not* harm to others." Pl.'s Ex. 32 (emphasis added). Then, too, Cohen had in hand the letter from Lundregan's landlord Patrick Heinig at Yellowstone Way saying that Lundregan was "a reputable and responsible tenant" who "ha[d] not caused [him] any problems." Pl.'s Ex. 47 at 2.

Most concerning of all, says Lundregan, the sum and substance of Cohen's "evidence" against her was never verified, never subjected to the crossfire of cross-examination at a hearing. It was Cohen, after all, who cancelled any such hearing.

Based on the foregoing, a trier of fact could reasonably conclude that Cohen violated Lundregan's rights under the FHA and/or her due process rights under the Fourteenth Amendment by improperly determining, without objective evidence and despite contradictory evidence, based only on her mental disability, that Lundregan constituted a "danger" and "direct threat" to others.

It is also fair argument that Lundregan's right to be free from discrimination based on her disability was at all relevant times clearly established. In *Corey v. Secretary, United States Department of Housing & Urban Development, ex rel. Walker*, the Fourth Circuit made clear that a public official, without objective evidence and without an individualized assessment, may not determine that the "direct threat" exception applies, and if he does he will be found to have discriminated against an individual on the basis of a mental disability in the terms, conditions, or privileges of her housing. 719 F.3d 322, 326–28 (4th Cir. 2013). The plain language of the FHA itself, *see* 42 U.S.C. § 3604(f)(1), (2), as well as joint guidance from the Department of Justice and the Department of Housing and Urban Development, buttress the point, *see* Department of Housing and Urban Development and the DOJ, *Reasonable Accommodations Under the Fair Housing Act*, 4 (2004) ("The [FHA] does not allow for exclusion of individuals based upon fear, speculation, or stereotype about a particular disability or persons with disabilities in general. A determination that an individual poses a direct threat must rely on an individualized assessment that is based on reliable objective evidence.").

The Court concludes that Cohen is not entitled to qualified immunity and will **DENY** his Motion for Summary Judgment.

###### B.    Defendant HOC is not entitled to Summary Judgment.

HOC has also moved for summary judgment as to all claims brought by Lundregan. As with Cohen, its arguments are unavailing. Genuine issues of material fact remain as to both the FHA and Due Process claims against HOC.

First, there is a genuine dispute as to whether in fact HOC ever "terminated" Lundregan's voucher. On the one hand, HOC argues that it did not, only that the voucher Lundregan once held automatically expired on April 25, 2018, because Lundregan failed to submit a written request for an extension prior to that date. On the other hand, the HOC issued notices to Lundregan on March 7, 2018 and April 11, 2018, stating that HOC "[wa]s terminating [her] subsidy" due to program violations. Def.'s Exs. 9, 11. But then, because Lundregan appealed the decision to terminate the subsidy, after which HOC reinstated her voucher without resuming the "termination" hearing, HOC took the position that she was never in fact terminated. It is not entirely clear what happened to the automatic "expiration" on April 25 rationale. No mention of it is made in the June Approval letter.

Lundregan, for her part, insists that HOC did in fact terminate her voucher for a time and points to several communications from HOC indicating as much. For example, on May 11, 2018, Cohen, in an email to Lundregan's counsel, stated that: "[a]ccording to HOC's records, Ms. Lundregan <u>was terminated</u> for the following reasons: 1. Delinquent rent; 2. Community disturbance; and 3. Property damage." Def.'s Ex. 14 (emphasis added). Additionally, the June Approval Letter Cohen sent to Lundregan's counsel led off with this declaration: "The problematic behaviors that led to your <u>termination</u> from the program are a violation of the terms of the program outlined in HOC's Administrative Plan for the Housing Choice Voucher program." Def.'s Ex. 17 at 3 (emphasis added). That letter acknowledged that Lundergan had "requested that HOC reinstate

17

[her] voucher because [her] disability-related needs unintentionally caused [her] to be evicted from [her] unit and terminated from the voucher program." *Id.* (emphasis added).

Without question, Lundregan has set forth a colorable argument that HOC in fact did terminate her voucher, or at least treated her as if her subsidy had been terminated for cause, and did so without HOC following the steps demanded by federal housing law.

There is a further dispute over whether the HOC improperly delayed acting upon Lundregan's request for a subsidy by attaching unduly invasive and unnecessary conditions on the accommodation they eventually did offer her.

HOC has argued that Lundregan's housing voucher automatically expired on April 25, 2018, because she failed to seek an extension in writing and on time. But Lundregan says she did in fact submit a written request for a reasonable accommodation to reinstate her voucher on April 23, 2018, two days before the voucher was set to expire. Def.'s Ex. 12. Then, at the informal hearing that was convened on April 25, 2018, Lundregan's counsel made a verbal request that the voucher remain in effect, *see* ECF No. 228 at 34–35; Pl.'s Ex. 24, and the next day, according to Lundregan, her counsel followed up on the verbal request by sending HOC a written request asking that "Lundregan's voucher be extended past the current expiration date." Pl.'s Ex. 24. Did Lundregan make a written request on April 23 and her attorney make an oral request on April 25? The trier of fact will have to decide.

Relevant regulations tend to support the conclusion that Lundregan's requests, if indeed they were made, should have been sufficient to justify an extension for an individual with a known disability. *See* 24 C.F.R. § 982.303(b)(2) (instructing that, if an individual "needs and requests an extension of the initial voucher term as a reasonable accommodation . . . to make the program accessible to . . . a person with disabilities," the HOC "must extend the voucher term up

to the term reasonably required for that purpose."). Even if the trier of fact were to conclude that Lundregan did not submit a written request for extension by April 25, it could also reasonably find that HOC, well aware of Lundregan's mental disability, should not have held her to the strict letter of the regulation that a written request be submitted prior to April 25, 2024, given Lundregan's continuous efforts to get the subsidy extended.

Even after HOC found that Lundregan was qualified for the accommodation she requested, even after it decided to reinstate her vouchers, HOC has continued to insist that it was she, not they, who blocked receipt of the subsidy. HOC argues, for example, that, after June 5, 2018, Lundregan could have gotten her subsidy if only she had filed the appropriate paperwork and submitted a qualifying lease. HOC claims that the lease at Yellowstone Way, where Lundregan lived as of mid-April, was non-compliant with its requirements because the home had four bedrooms as opposed to one. ECF No. 228 at 29. Lundregan disputes that the address was non-compliant, *id.* at 30, but regardless, she says, she and her counsel reached out to HOC several times from May through July while she was staying at Yellowstone Way to request information as to the status of her voucher seeking to explain to HOC that she could not pay rent and that she was facing homelessness if she did not get her subsidy. *See id.* at 39–40; *see also* Pl.'s Ex. 34, 47. Despite those pleas for information and indulgence, Lundregan claims HOC never told her that she needed to find a new property or that she needed to submit further paperwork in order to receive her subsidy. *See* ECF No. 228 at 39–40.

Further, as mentioned several times earlier, the June Approval Letter sent by Cohen contained language indicating that Lundregan's accommodation would be contingent on her agreeing to continued health treatment.[6] *See* Def.'s Ex. 17 at 4. And, once again, the letter

---

[6] Neither Plaintiff nor Defendants has raised the point, but the Court wonders if a housing official is even <u>authorized to require</u> an applicant to submit to medical treatment as a condition of obtaining a subsidy.

contained statements referring to Lundregan's allegedly destructive conduct that Defendants knew she vigorously contested, conduct they had never established based on objective findings. *See id.* at 3–4. It would certainly be plausible to conclude that Lundregan might have wanted to hold off signing the Letter. Arguably, therefore, the delay was by no means exclusively the fault of Lundregan if, indeed, it was her fault at all.

Ultimately, it would be reasonable for the trier of fact to conclude that the evidence HOC had about Lundregan was not sufficient to justify HOC's actions. Here, too, Lundregan argues that HOC relied almost exclusively on unilateral statements from her antagonistic former landlord, Ramakumar in concluding that she had violated the terms of the voucher program, again with no attempt on the part of HOC to verify those claims.

At least some evidence in the record arguably undercuts the reliability of statements Ramakumar made against Lundregan. *See* Pl.'s Exs. 7, 41, 47. The photographs he submitted to HOC as proof of his claim of "substantial" property damage do appear to show a large amount of trash left in the apartment, and, although Lundregan asserts that the photographs were staged, HOC had no other evidence that any property was actually "damaged," even minimally, much less that the damage was "substantial." *See* Def.'s Ex. 3. No receipts for repairs were ever received from Ramakumar. As to the report by an elderly tenant that Lundregan had stolen her keys, Lundregan sent an email to HOC not only denying the accusation but explaining that the woman's son had in fact found the keys. *See* Pl.'s Ex. 38. It is not clear what follow-up, if any, was pursued by Defendants as to this claim. And, again, HOC was in possession of statements contradicting its assumption that Lundregan posed "a threat": First, there are the letters from Lundregan's psychologist, Dr. Gottlieb, to HOC, disavowing that Lundregan in any way might be a threat to others. *See* Pl.'s Ex. 32. Then, too, is the letter from Patrick Heinig, Lundrgan's landlord at

20

Yellowstone Way, to HOC, dated May 21, 2018, stating that Lundregan "is a reputable and responsible tenant" who "ha[d] not caused [him] any problems." Pl.'s Ex. 47 at 2.

In all, as far as HOC is concerned, the trier of fact could reasonably find that the HOC did "terminate" Lundregan's voucher, at least for a time, and that it did so without sufficient evidence and without holding an objective hearing as requested by her.

When HOC deals with an individual with a known mental disability such as Lundregan, it would be reasonable to argue that the individual ought to be given at least some latitude as she attempts to navigate the formal processes to gain access to the assistance she needs. Is that not, after all, what the very purpose of a reasonable accommodation is — to make housing assistance programs like the Housing Choice Voucher Program "accessible to . . . a person with disabilities"? 24 C.F.R. § 982.303(b)(2). And if a landlord or some other individual conjures negative allegations against someone with a disability, could it not place some obligation on HOC to go beyond one-sided allegations of witnesses and subject them to cross-examination (or permit the target of the allegations to do so), before concluding that assistance to the targeted individual should be terminated?

Genuine disputes of material fact abound at this juncture. The Court will therefore **DENY** HOC's summary judgment.

### C.      **Lundregan is not entitled to Summary Judgment.**

Lundregan has filed her own Motion for Summary Judgment as to Defendants' liability. Because, as noted above, several genuine disputes of material fact are present, the Court will also **DENY** Lundregan's Motion for Summary Judgment.

21

## V.   CONCLUSION

Accordingly, Defendants' Motion for Summary Judgment (ECF No. 180) and Lundregan's Motion for Summary Judgment (ECF Nos. 196, 198) are **DENIED**.

A separate Order will **ISSUE**.


April 24, 2024                                                    _____

PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE